**UNITED STATES v. ELDREDGE et al.**

No. 1187.

District Court, D. Montana.

April 25, 1940.

C. W. Buntin, Sp. Asst. Atty. Gen., of Glasgow, Mont., for plaintiff.

Ernest L. Walton, of Wolf Point, Mont., and John M. Kline and C. H. Roberts, both of Glasgow, Mont., for defendants.

Harrison J. Freebourn, Atty. Gen., for defendant and cross-complainant State of Montana.

PRAY, District Judge.

The above-entitled action was commenced on behalf of the Fort Peck Public Works Project in Montana to condemn for a public use the following described lands: Lots (6) and (9) of Section (28); Lots (1), (3) and (6) and the Northeast Quarter of the Northwest Quarter (NE¼ NW¼) of Section (33), Township (26) North of Range (41) East of the Montana Meridian, situated in Garfield County, State of Montana, containing 206.33 acres, more or less, including all the lands, if any, added thereto by reliction, alluvion or accretion.

The particular question before the court at this time arises over the issue of title to certain lands hereinafter mentioned and adjacent to above-described lands. The defendant Eldredge admitted that he was the record owner of the lands above described, and alleged ownership of the lands adjacent thereto as accretion lands which included an abandoned channel of the Missouri River consisting of 250 acres, more or less. The Missouri River had changed its channel by cutting across an ox-bow loop, thereby leaving the old channel of the river as abandoned land; this occurred in 1918. The State of Montana claimed the lands in dispute as accretion lands. From the evidence it appeared that after the survey of these lands the river had moved easterly, and that a large part of the lands in dispute had been formed prior to the entry of adjoining lands, above described, under the Homestead Laws. The plaintiff claimed a superior right to the lands lying easterly of the aforesaid homesteaded lands. It was ordered that the issue of title to the lands in dispute, the accretion lands, should be tried before the issue of compensation for the taking of the lands by plaintiff.

The official plat of survey of Township 26 North of Range 41 East of M. M., made in 1907 and approved by the Surveyor General August 11th, 1908, shows the tract of land lying easterly of the meander line marking the right bank of the river descending, which is in controversy. When the river occupied the old channel it flowed around a neck of land known as Peck's Point; it has since then become partially filled with soil. Several maps, plats and field notes were introduced in support of the plaintiff's contentions. Captain Ewart G. Plank, U. S. A., testified from a large map, consisting of an enlarged aerial photograph, with survey lines super-imposed, showing the identical lands in dispute, and also the homesteaded lands first above described, and owned by defendant Thomas H. Eldredge, which were surrounded by a red boundary line. The river is shown according to the survey of 1907, with meander lines shaded green, and the river as it existed in the 1918 avulsion, running easterly of the lands of defendant Eldredge, is shown by two orange lines marking the right and left bank descending. This plat was identified and received in evidence as Exhibit No. 6. A stand of timber appears on the plat in dark shadows, growing on the accretion lands lying easterly of the meander line and on the lands in dispute.

The original homestead entry was made on May 9th, 1916, under Sec. 2289, R.S.,

43 U.S.C.A. § 161, for 160 acres by Herman A. Mielke, and embraced the lands first described, with the exception of Lot 6, which was taken under a homestead made May 9th, 1916, by Carrie Crider. The patent to Mielke conveyed 165.38 acres. He could take only 160 acres under that section of the statute, but the rule of approximation enabled him to take land in excess thereof where the lot or subdivision happened to be in excess, paying for it at the rate of $1.25 per acre. It appears from the evidence that when the survey of 1907 was being made the river was very high, and that the meander line was run as indicated on the map, and that east of it was a slough filled up by the high water in which vegetation was growing; there were other lands farther east, containing a growth of small trees, which were situated between the meander line, marking the easterly boundary of the above-described lands, and the channel of the river which was approximately half a mile eastwardly. The above facts were testified to by Roy L. Sheppard who was on the lands in dispute in the spring of 1907 while the lands were being surveyed and whose brother was then a member of the surveying party.

Chester T. Taylor testified that he resided in the vicinity of these disputed lands in 1913, had been on them and was familiar with them; that he was over them in October, 1913, and found them in place, all dry, with willows growing along the west part and no water in the slough; he testified to a conversation with Herman A. Mielke, homestead entryman aforesaid, in which the latter stated that he had investigated and found that he could not hold the accretion land, and that the only way he could get it would be to have it surveyed and then have someone else homestead it. Mr. Taylor further testified that the river cut the new channel when the ice broke up in the spring of 1918, and that the channel now referred to as the abandoned channel was the channel of the river at the time of the avulsion. Another witness was familiar with the lands from 1902 to 1913 and testified that the lands in question consisted of a large body of land formed and above low-water mark when he was on the lands in 1910; he estimated the amount of accretion lands at 200 acres. Another witness was familiar with the old river bank and the meander line and said that he cut hay on these lands in September, 1914, consisting of clover and willows, and had grazed his livestock thereon. Captain Plank testified that from his experience as an engineer that these lands were never an island; that the lands east of the meander line had been produced through the years by the normal process of accretion and that they did not come into existence by accretion to an island. The defendant Eldredge testified that he came to Montana in 1913. He was familiar with the lands in question as set forth on the map marked as Exhibit 6, and that he purchased the lands first described herein from Herman A. Mielke in 1928 for $10,000, giving a mortgage back to secure the balance of the purchase price; that the vendor told him at the time of the purchase that the lands here in dispute went with the patented lands, and that a part of the consideration was based upon acquiring the additional or accretion lands. There is very little, if any, contradictory evidence in the record.

There seems to be no question that practically all of the lands in dispute had been formed and were in place when Herman A. Mielke made his homestead entry. The deed from Mielke to Eldredge contained no reference to the lands in dispute nor to any lands other than those above described, nor did the mortgage for $7,000 which was given in return. Many authorities have been cited by counsel on both sides but the weight of authority seems to be decidedly in favor of plaintiff's contentions, and here the cases generally are found to be more directly in point. "The title of the government to land bordering on the Missouri river is subject to the same laws as that of a private owner. If it is cut off by erosion, the government loses title thereto, and, if accretions are added, they become a part of the government tract. Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872." Bigelow v. Herrink, 200 Iowa 830, 205 N.W. 531, 533; 45 C.J. 526.

■■■■ Under the rule adopted by the State of Montana the riparian owner owned land to the low-water mark of a navigable stream or lake, and in the present case the state can claim only that portion of the land in question occupied by the Missouri River at the time of the avulsion in 1918 extending to the ordinary low water mark. It is admitted that this river is a navigable stream. On the admission of the state to the union it became the owner of the bed of the river, subject to the

rights of the government in respect to navigation, as indicated by the following statutory provision: "The state is the owner of all land below the water of a navigable lake or stream * * *." Sec. 6674, R.C.M.1935. And the further provision as to the boundaries of water: "Except where the grant under which the land is held indicates a different intent, the owner of the land, when it borders upon a navigable lake or stream, takes to the edge of the lake or stream at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream." Sec. 6771, R.C.M.1935.

Counsel for plaintiff cited the rule that when a meander line is run where no lake or stream calling for it exists, or where it is established so far from the actual shore as to leave between its course and the shore such an excess of unsurveyed land as clearly indicates fraud or mistake, the meander line becomes the boundary and not the shore line, and if the United States has not parted with its right to the land left unsurveyed, it may cause a survey to be made and dispose of it as a part of the public domain. Security L. & E. Co. v. Burns, 193 U.S. 167, 24 S.Ct. 425, 48 L.Ed. 662; Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171; Id., 6 Cir., 85 F. 45; Lee Wilson & Co. v. United States, 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128.

If it should appear that at the time the homestead entry was made, a large body of land formed by accretion, existed between the meander line and the waters of the stream, and where to extend the lines of the entry and the lands conveyed by the patent to the waters of the stream would give the entryman an acreage largely in excess of what the patent calls for, while to limit the entry to the meander line will give the entryman all the acreage his patent calls for, and all that he paid for, then the court will construe the patent to mean that the meander line was intended to be the boundary line. Lammers v. Nissen, 154 U.S. 650, 14 S.Ct. 1189, 25 L.Ed. 562; Gleason v. White, 199 U.S. 54, 25 S.Ct. 782, 50 L.Ed. 87; Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68. Another rule is cited as to the conclusiveness of the plat, to the effect that it is conclusive as to the government and individuals in respect to lands within the meander line; however, a claimant adverse to patentee may show that water course

did not exist or that there was a large body of unsurveyed land beyond meander line at time of survey. Patentee may show that this was formed by accretion after his entry. French-Glenn Live Stock Co. v. Springer, 185 U.S. 47, 22 S.Ct. 563, 46 L.Ed. 800; Producers' Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330; Kirwan v. Murphy, 189 U.S. 35, 23 S.Ct. 599, 47 L.Ed. 698; Security L. & E. Co. v. Burns, supra.

The purpose of running meander lines is not to define the boundaries of the tract of land but to define the sinuosities of the stream, and as a means of ascertaining the quantity of land in the fraction subject to sale and which is to be paid for by the purchaser. St. Paul & P. R. Co. v. Schurmeier, 7 Wall 272–286, 19 L.Ed. 74.

The question of adverse possession has been called to attention, but as it seems to the court it requires no further comment than reference to the case of Bode v. Rollwitz, 60 Mont. 481, 199 P. 688, 692, wherein the court held: "although the land in dispute was in the possession and occupancy of the plaintiff and her predecessor in interest for more than 30 years, neither she nor her grantor could secure title to it by adverse possession, use, or occupancy for any length of time as against the government."

According to the general rule a public grant is to be interpreted in favor of the grantor, whereas one between private parties is to be interpreted in favor of the grantee. Sec. 6852, R.C.M.1935; 50 C.J. 959; Story v. Woolverton, et al., 31 Mont. 346, 78 P. 589; United States v. Oregon & C. R. Co., et al., C.C., 186 F. 861; Oregon & C. R. Co. v. United States, 238 U. S. 393, 35 S.Ct. 908, 59 L.Ed. 1360.

Testimony was given concerning statements made by the original entryman, the defendant, Mielke, about the property in dispute. There is a special provision in the Montana Codes providing for the reception of evidence of that character: "Declarations of predecessor in title evidence. Where, however, one derives title to real property from another, the declaration, act, or omission of the latter, while holding the title, in relation to the property, is evidence against the former." Sec. 10510, R.C.M.1935; Delmoe v. Long, 35 Mont. 139, 154, 88 P. 778.

On the subject of alluvion the general rule appears in the language of the

statute which provides as follows: "Where, from natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right-of-way over the bank." Section 6820, R.C.M.1935.

The fact seems to have been established by proof that is clear and convincing that the lands here in question were in place at the time the survey was made and likewise when the adjoining lands were homesteaded, and that such area in controversy consisted of a large body of land between the meander line and the low-water mark of the river, and that consequently, the court being fully advised as to material facts and the law, such lands and the accretions thereto, should be held to be, actually were and continued to be, the property of the plaintiff herein, save and except the abandoned bed of the stream which belongs to the State of Montana. Granger v. Swart, 10 Fed.Cas. 961, No. 5685; Lammers v. Nissen, 154 U.S. 650, 14 S.Ct. 1189, 25 L.Ed. 562.

It therefore follows that the plaintiff is entitled to a decree in its favor quieting title to the lands in dispute.

Findings of fact and conclusions of law as provided by the rule, conforming to the foregoing views, will be signed by the court and filed herein.